IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

GLOBAL PAYMENTS INC. and TOTAL     *
SYSTEMS SERVICES, LLC,
                                   *
       Plaintiffs,
                                   *
vs.                                        CASE NO. 4:20-CV-185 (CDL)
                                   *
JASON TODD GREEN,
                                   *
       Defendant.
                                   *
_____
                                   *

<u>ORDER AND PRELIMINARY INJUNCTION</u>

Global Payments Inc. and Total Systems Services, LLC (collectively, "TSYS")[1] bring this action against a former employee, Jason Todd Green, alleging that he breached four separate non-compete covenants with TSYS by going to work for its competitor, BlueSnap, Inc.   TSYS moves for a preliminary injunction, asking the Court to enjoin Green from working for BlueSnap through trial and from using or disclosing TSYS's confidential or trade secret information in his possession, custody, or control (ECF No. 8).   For the following reasons, the Court grants TSYS's motion.

---

[1] Total Systems Services, LLC is a subsidiary of Global Payments Inc., and it was formed as part of a merger between Global Payments Inc. and Total Systems Services, Inc.   Edelen Decl. ¶¶ 4-5, ECF No. 8-6.   Total Systems Services, LLC and Global Payments Inc. are the successors in interest of Total Systems Services, Inc.'s rights under the non-compete covenants in this case.   *Id.* ¶ 7.   For the sake of simplicity, the Court will refer to these entities collectively as "TSYS."

FACTUAL BACKGROUND

TSYS is one of the leading worldwide providers of payment technology services, embedded e-commerce solutions, integrated payment solutions, multi-platform payment solutions, and software solutions.  Hyde Decl. ¶ 5, ECF No. 8-2.  To put it simply, TSYS facilitates the movement of financial and payment information in electronic commerce so that merchants can accept electronic payments anywhere TSYS offers its services.  Kernodle Decl. ¶ 5, ECF No. 21.  TSYS enables merchants to accept payments through credit, debit, and other electronic means in situations where the customer's credit or debit card is present (*e.g.*, when the customer swipes his card in a card reader at a store) and also in situations where the card is not present (*e.g.*, when the customer purchases something from a merchant over the internet).  *Id*. ¶ 6; Green Dep. 59:8-12, 169:7-14, 212:10-213:2, ECF No. 19-2.  TSYS offers its services throughout North America, Europe, Latin America, and Asia.  Kernodle Decl. ¶ 5.  The industry in which TSYS operates is extremely competitive, and TSYS makes efforts to protect its confidential information, as well as its relationships with its clients, channel partners, and employees.  Hyde Decl. ¶¶ 8-9.

## I.   Green's Role at TSYS

From February 5, 2018 through May 1, 2020, Green served as "Vice President, Channel Sales Distribution" and then as "Vice President of Direct Sales Distribution" for TSYS.  Edelen Decl.

¶ 8.  In these roles, Green wore many hats.  He was involved in the strategic planning of his department's overall sales and revenue generating operations, which included brainstorming strategies to enhance TSYS's cross-border and multi-currency businesses.  Hyde Decl. ¶ 12; Kernodle Decl. ¶¶ 16-17; *see also* Kernodle Decl. attach. 3, 2020 Leadership Meeting Presentation (Feb. 11-12, 2020), ECF No. 21-3 (February 2020 report Green helped prepare for TSYS's executives and high-level managers explaining TSYS's sales strategies related to Canadian and international business).  He established compensation plans for his department's sales force, determined lead generation processes and practices, was responsible for conversion rates and value extraction of leads, and established sales and revenue growth strategies and best practices.  Hyde Decl. ¶ 16.  He also managed and supervised 140 TSYS employees throughout North America, who he had authority to hire and fire.  *Id.* ¶ 11.  He and his team of employees solicited current and prospective customers and partners to sell TSYS's products and services to.  *Id.*  Green's sales teams sold services to merchants located anywhere that TSYS does business—North America, Europe, Latin America, and Asia.  Green Dep. 25:14-17, 28:19-22, 41:8-15; Kernodle Decl. ¶ 15.  He regularly travelled to see TSYS's customers, channel partners, and employees throughout North America and developed and maintained relationships with these individuals.  Hyde Decl. ¶ 15.

In his roles at TSYS, Green had access to information TSYS considers confidential and proprietary related to its relationships, customers and partners, prospective customers and partners, sales and marketing plans, business and strategic plans, operations, employee compensation, and sales workforce. *Id*. ¶ 13. He knew about TSYS's revenue shares with its partners and about the integration process across a wide range of software integrations. *Id*. ¶ 17.

## II.  The 2018, 2019, and 2020 Stock Awards and Associated Non-Compete Covenants

In 2018, 2019, and 2020, Green received grants of restricted TSYS stock. Edelen Decl. ex. A, Time-Based Restricted Stock Unit Agreement (2018 Tier II) (Mar. 9, 2018), ECF No. 8-7 ["2018 Stock Grant"]; *id*. ex. B, Time-Based Restricted Stock Unit Agreement (2019 Tier II) (Feb. 13, 2019), ECF No. 8-8 ["2019 Stock Grant"]; *id*. ex. C, Restricted Stock Award Certificate (Feb. 24, 2020), ECF No. 8-9 ["2020 Stock Grant"]. In exchange for the stock awards, Green agreed to abide by certain terms and conditions, including covenants not to compete. *See* 2018 Stock Grant ex. A ¶ 3; 2019 Stock Grant ex. A ¶ 3; 2020 Stock Grant §§ 15, 15.1.

The non-compete covenants in the 2018 and 2019 stock grants are almost identical. They state:

> [Green] agrees and covenants that for a period of one
> (1) year from and after his termination of employment,
> [Green] shall not, directly or indirectly, whether
> personally or through another person or entity, perform

> any of the Prohibited Activities (as defined below) in
> the Territory (as defined below) or any part thereof for
> or on behalf of [himself] or any other person or entity
> that competes with the Business (as defined below) or
> any part thereof, without the written consent of the
> Chief Executive Officer or Chief HR Officer of [TSYS].

2018 Stock Grant ex. A ¶ 3; 2019 Stock Grant ex. A ¶ 3.  The 2018

and 2019 covenants then define "Prohibited Activities" as:

> activities of the type conducted, provided, or offered
> by [Green] within two (2) years prior to his termination
> of   employment,   including   supervisory,   management,
> operational, business development, maintenance of client
> relationships, corporate strategy, community relations,
> public   policy,   regulatory   strategy,   sales,   marketing,
> investor   relations,   financial,   accounting,   information
> security,   legal,   human   resource,   technical   and   other
> similar or related activities and including service as
> a director or in any similar capacity.

2018 Stock Grant ex. A ¶ 3(a)(i); 2019 Stock Grant ex. A ¶ 3(a)(i).

The 2018 and 2019 covenants define "Territory" as "each geographic

area in which [TSYS] conducts the Business during the last two (2)

years of [Green's] employment," and then they list examples of

such areas.  2018 Stock Grant ex. A ¶ 3(a)(ii); 2019 Stock Grant

ex. A ¶ 3(a)(ii).  Finally, the 2018 and 2019 covenants define

"Business" as:

> the   business   of   (i)   providing   payment   processing
> services   to   financial   and   non-financial   institutions;
> (ii)   performing   services,   acquiring   solutions   and
> related   systems   and   integrated   support   services   to
> merchant   acquiring   and   merchants   (iii)   providing
> general-purpose   reloadable   prepaid   debit   cards   and
> payroll   chards   and   alternative   financial   services   to
> underbanked consumers and others; (iv) providing certain
> payments-related   reselling   services,   information
> reporting   services   related   to   transactions,   billing
> services, point of sale equipment sales and services,

> and other value-added services (including fraud
> detection, mitigation and management services) relating
> to (i)- (iii); or (v), or similar or related businesses
> or activities conducted, authorized, offered or provided
> by [TSYS] within two (2) years prior to the date of
> [Green's] termination of employment.

2018 Stock Grant ex. A ¶ 3(a)(iii); 2019 Stock Grant ex. A
¶ 3(a)(iii).

The non-compete covenant in the 2020 stock grant uses
different language. It states:

> During the term of [Green's] employment and for a period
> of twelve (12) months immediately following the
> termination of [Green's] employment for any reason,
> [Green] shall not, directly or indirectly, seek or
> obtain any employment, independent contractor or
> consulting relationship with a Competitor or otherwise
> provide any form of assistance or services to a
> Competitor, whether paid or unpaid, in the geographic
> area as to which [Green] has authority, has duties or
> conducts business for [TSYS], which consists of the
> geographic area in which [TSYS] conducts business, in
> which relationship [Green] has duties for (or provides
> services to) such Competitor that relates to Competitive
> Services and are the same or similar to those services
> actually performed by [Green] for [TSYS] . . . .

2020 Stock Grant § 15.1. The 2020 covenant then defines
"Competitor" as "any individual, corporation, partnership, joint
venture, limited liability company, association, or other entity
or enterprise which is engaged, wholly or in part, in Competitive
Services," and then it lists examples of companies considered
Competitors. *Id*. § 15.4(b). It defines "Competitive Services"
as:

> services competitive with the business activities
> engaged in by [TSYS] as of the date of termination of

[Green's] employment for any reason . . . which include, but are not limited to, the provision of products and services to facilitate or assist with the movement in electronic commerce of payment and financial information, merchant acquiring, demand deposit accounts or other financial service solutions to the underbanked and other consumers and businesses, payment solutions to card issuers, and software, payroll and processing solutions.

*Id.* § 15.4(a).

### III. Green's Termination, Severance Package, and Associated Non-Compete Covenant

On May 1, 2020, TSYS terminated Green's employment as part of a reduction in force. Edelen Decl. ¶ 14. Green executed a separation agreement on May 4, 2020 in exchange for a severance payment of almost $90,000 and accelerated vesting of approximately $41,000 of TSYS stock. *Id.* ¶ 15; *id.* ex. D, Letter from R. Thompson to J. Green (May 1, 2020), ECF No. 8-10 ["Separation Agreement"]. The separation agreement contained another non-compete covenant which mirrored the language in the 2020 stock grant covenant in all material respects. Separation Agreement 3-4.

Green also agreed in the separation agreement that he had returned all of TSYS's property, including, "sales information and documentation, personnel information and documentation, legal information and documentation, customer information and documentation, business correspondence, contracts, financial information, notes, data compilations, business records and technical documentation and any copies thereof." *Id.* at 2.

7

Despite this representation, Green retained emails he forwarded to his personal Gmail account containing TSYS's confidential information about its sales and marketing strategies, its employee compensation plans, its customers and partners, and a correspondence with in-house legal counsel regarding a contract for a TSYS customer.  Kernodle Decl. ¶ 18; *id*. attach. 4, Email from J. Green to G. Cicchinelli, *et al*. (Oct. 4, 2018), ECF No. 21-4 (forwarded email regarding sales meeting); *id*. attach. 5, Email from C. Ancona to J. Green, *et al*. (Aug. 20, 2018), ECF No. 21-5 (forwarded email regarding compensation); *id*. attach. 6, Emails between G. Amendola, J. Green, and K. Ghiloni (Mar. 4, 2019- Mar. 7, 2019), ECF No. 21-6 (forwarded emails regarding sales organization); *id*. attach. 7, Email from J. Green to A. Dodge, *et al*. (Mar. 22, 2019), ECF No. 21-7 (forwarded email regarding sales initiatives); *id*. attach. 8, Email from G. Cicchinelli to J. Green and M. Morrow (Mar. 22, 2019), ECF No. 21-8 (forwarded email regarding sales); *id*. attach. 9, Email from K. Richardson to P. Carsley, *et al*. (Apr. 9, 2020), ECF No. 21-9 (forwarded email containing in-house legal counsel's communication).

## IV.  Green's Subsequent Employment with BlueSnap

Three months after his termination, in August 2020, Green began working for BlueSnap, a company in the electronic payment space that provides, among other things, merchants with the ability to accept credit card payments from customers via online and phone

transactions.  BlueSnap Dep. 143:12-145:22, 248:17-23, 257:10-16, 292:1-16, ECF No. 19-5.  BlueSnap provides merchants this ability to accept electronic payments anywhere it offers its services—namely, North America and Europe.  *Id.* at 292:9-16; Green Decl. ¶ 9(a)-(g), ECF No. 9.  According to its website, the services BlueSnap provides include integrated payment solutions, payment routing, authorization, fraud prevention, chargeback management, and analytics and reporting.  Hyde Decl. ¶ 24.  BlueSnap admits that it directly competed against TSYS at least 31 times in the last 18 months.  BlueSnap Dep. 61:24-62:13, 62:18-24, 76:8-77:6. In fact, BlueSnap is currently competing with TSYS for business with one of TSYS's existing software partners, SingleOps, which, if successful, could result in TSYS losing millions of dollars. Kernodle Decl. ¶ 10.

BlueSnap hired Green as its Senior Vice President of Global Sales.  BlueSnap issued a press release on August 6, 2020, announcing Green's hiring and stating that Green will "lead the strategic direction and overall management of [BlueSnap's] global sales force and revenue generating operations across a range of sales channels."  Hyde Decl. ex. A, Press Release 1 (Aug. 6, 2020), ECF No. 8-3.  The release stated, "Green brings over 20 years of sales leadership in the payment space to BlueSnap with extensive experience in payments and fintech from his roles at TSYS . . . ." *Id.*

DISCUSSION

TSYS asserts that Green breached his covenants not to compete by accepting employment with BlueSnap within one year of leaving TSYS.  It initiated this action and asks the Court to preliminarily enjoin Green from working for BlueSnap.  To receive a preliminary injunction, TSYS must show "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [it] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998).  For the following reasons, the Court finds that TSYS has met its burden.

## I.   Likelihood of Success on the Merits

TSYS has shown it is likely to succeed on the merits of its breach of contract claims against Green.  Specifically, it has shown that the non-compete covenants are likely valid and enforceable, and Green likely breached them.

### A.   Validity and Enforceability of the Covenants

Under the Georgia Restrictive Covenants Act ("GRCA"), a non-compete covenant is valid when it is: (1) reasonable in time, geographic area, and scope of prohibited activities, O.C.G.A. § 13-8-53(a); (2) applied to certain categories of employees, *id.* § 13-8-53(a)(1)-(4); and justified by a legitimate business

interest, *id.* § 13-8-55.  *See Kennedy v. Shave Barber Co.*, 822 S.E.2d 606, 611-13 (Ga. Ct. App. 2018).

> 1.  *Reasonable in Time, Geographic Area, and Scope of Prohibited Activities*

Here, the covenants are limited to one year, which is presumptively reasonable.  O.C.G.A. § 13-8-57(b).  The covenants are also reasonable in the scope of prohibited activities because they only prohibit Green from performing the type of activities he performed while at TSYS, and they only prohibit him from performing those activities for competitors who provide the same types of services TSYS provides.  *See id.* § 13-8-56(3) ("The scope of competition restricted is measured by the business of the employer or other person or entity in whose favor the restrictive covenant is given[.]"); *Kennedy*, 822 S.E.2d at 613 (finding a non-compete covenant was reasonable in scope because it did not bar the former employee from working for any competitor in any capacity—it barred her from competing with her former employer by working for a competitor "selling or providing the *services* the same or similar to that provided by [the former employer]").[2]

--------

[2] Green cites pre-GRCA case law to suggest that the language the covenants use to describe the prohibited activities is too vague, thereby rendering the covenants unenforceable as a matter of law.  See *Fantastic Sams Salons Corp. v. Maxie Enters., Inc.*, 3:11-CV-22 (CDL), 2012 WL 210889, at *3 (M.D. Ga. Jan. 24, 2012) (citing *Howard Schultz & Assocs. of the Se., Inc. v. Broniec*, 236 S.E.2d 265, 268 (Ga. 1977)).  But the GRCA is more deferential to covenants not to compete and authorizes the language used in the present covenants.  See O.C.G.A. § 13-8-53(c)(2) ("Activities, products, or services shall be considered sufficiently described if a reference to the activities, products, or services is

The next question is whether the covenants have an unreasonable geographic area. Under the GRCA, the geographic territory is presumptively reasonable if it "includes the areas in which the employer does business at any time during the parties' relationship" and "[t]he total distance encompassed by the provisions of the covenant also is reasonable" and/or "[t]he agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship." O.C.G.A. § 13-8-56(2).

Here, the four non-compete covenants are restricted to the areas where TSYS does business—North America, Europe, Latin America, and Asia. Green argues that the total distance this encompasses is, nevertheless, unreasonable because he only conducted business on behalf of TSYS in the United States. However, the present record does not support Green's assertion. TSYS offered multiple examples of instances where Green, as one of the highest-level officers in TSYS's sales department, was responsible for TSYS's overall sales strategies—not just its sales strategies in the United States. His sales teams sold services to merchants located anywhere TSYS does business; he brainstormed

---

provided and qualified by the phrase 'of the type conducted, authorized, offered, or provided within two years prior to termination' or similar language containing the same or a lesser time period."). Moreover, Green had "fair notice" of the covenants' impact, as required by O.C.G.A. § 13-8-53(c)(1), because all the restrictions are stated in the agreements and Green could reasonably determine the maximum scope of the restraints at the time of termination. *See id.* § 13-8-53(c)(2).

sales strategies to enhance TSYS's cross-border and multi-currency businesses; he prepared reports anticipating business needs for companies moving into the Canadian market; he prepared a presentation for TSYS's executives laying out specific sales strategies related to its Canadian and international business. These specific examples of Green's actual duties combined with the undisputed fact that he occupied a high-level strategic and leadership role as the Vice President of direct sales at TSYS clearly establish that the geographic area where TSYS did business and the geographic area where Green conducted business on behalf of TSYS were one in the same.  Therefore, the total distance covered by the covenants is reasonable.  Accordingly, TSYS is substantially likely to succeed in showing that the covenants are reasonable in geographic scope, scope of prohibited activities, and time.

> 2.  *Category of Employees to which Non-Compete Covenants May Apply*

At TSYS, Green managed over 140 sales employees throughout North America whom he had authority to hire and fire, solicited and interacted with TSYS's existing and prospective customers and partners for the purpose of selling TSYS's products and services, and was directly responsible for managing the sales force of a division of TSYS.  Therefore, he fits within several categories of employees to whom non-compete covenants may apply.  *See* O.C.G.A.

§ 13-8-53(a)(1)-(4) (noting non-compete covenants may apply to employees who regularly solicit customers, engage in sales, perform the duties of a key employee, or have the duty of managing a department and regularly direct the work of employees and have the authority to hire or fire them).

### 3. Legitimate Business Interest

TSYS has a legitimate business interest in protecting its investment in Green, as well as protecting its client and partner relationships, goodwill, and confidential and trade secret information from unfair competition. *See* O.C.G.A. § 13-8-51(9) ("legitimate business interest[s] include, but are not limited to, "[t]rade secrets," "[v]aluable confidential information," "[s]ubstantial relationships with specific prospective or existing customers," "good will," and "specialized training").

**********************

In summary, the covenants not to compete signed by Green are reasonable in time, geographic area, and scope of prohibited activities; Green falls within the category of employees who are bound by such covenants under Georgia law; and TSYS had legitimate business interests for requiring Green to enter into the covenants. Accordingly, they are valid and enforceable. *Kennedy*, 822 S.E.2d at 611-13.

B.   Green's Miscellaneous Arguments

Green argues that even if the covenants comply with Georgia law as to their scope, TSYS should not be granted a preliminary injunction to enforce them because the covenants lacked consideration and because TSYS's insistence upon their enforcement violates the implied duty of good faith and fair dealing and the principle of unclean hands.  The Court addresses these arguments in turn.

First, as noted previously, Green signed a covenant not to compete each time he received a stock grant.  These stock grants certainly amounted to valuable consideration.  But according to Green, TSYS had a pre-existing obligation to award him the stock grants without requiring him to sign a covenant not to compete. Green points to representations in a 2017 Omnibus Plan and argues that by adding the non-compete conditions for the 2018, 2019, and 2020 stock grants, TSYS modified his rights under the 2017 Omnibus Plan without any new consideration.  The Court notes that the 2017 Omnibus Plan explicitly contemplated that TSYS had the discretion to attach conditions to the stock awards.  It stated: "Restricted Stock Units may be granted to Participants in such number, *and upon such terms*, and at any time and from time to time as shall be determined by the Committee."  2017 Omnibus Plan § 9.1 (emphasis

added).[3]  Therefore, the agreement expressly contemplates that TSYS may attach terms to the granting of the stock awards, and thus Green's lack of consideration argument fails.  Green argues, however, that TSYS's decision to attach terms related to his employment violated its duty of good faith because the parties contemplated that any restrictions would only relate to the stock itself.  The Court finds this dubious contention unpersuasive. But even if the Court accepted it, TSYS is nevertheless likely to prevail on its contention that at least one of the covenants was supported by consideration.  The non-compete covenant in Green's separation agreement was certainly supported by consideration—the payment of $90,000.00 in severance pay plus acceleration of his right to certain stock awards.  That covenant standing alone would be sufficient to support TSYS's motion for preliminary injunction.[4] Counsel's *creative* lack of consideration arguments will not rescue Green from being bound by his agreement.

With perhaps more creativity but equal lack of persuasiveness, Green's counsel next argues that TSYS had some

---

[3] Green failed to place a copy of the 2017 Omnibus Plan in the record. The Court assumes for purposes of this Order that this language Green quotes from the 2017 Omnibus Plan is correct.

[4] The Court rejects any argument that TSYS was already obligated to pay these severance benefits based on its representations in a 2019 letter. Green Decl. (Aug. 27, 2020) ex. B, Letter from R. Harrelson to J. Green (Sept. 6, 2019), ECF No. 20-1 at 28.  The 2019 letter only entitled Green to two weeks' pay, subsidized COBRA medical coverage, and outplacement benefits.  *Id.*  Because Green ultimately received much more than this in his separation agreement, there was sufficient new consideration to support his covenant not to compete.

obligation to discuss its concerns with Green before suing him. Failure to do so, according to Green's counsel, violates the duty of good faith implicit in the performance of all contracts and constitutes unclean hands, thus precluding equitable relief. The Court is familiar with the general principle that all contracts contain an implied duty that they will be performed in good faith. But Green points to no term in the covenants that he contends were not performed in good faith. Instead, he seeks to rewrite the contract to add a new term—a requirement that TSYS talk with him before it sued him. Accepting this expansion of the implied duty of good faith would create a precedent that every contract impliedly includes a mandatory mediation or notice of suit clause even though the parties never agreed to such terms. The implied duty of good faith requires no such thing. Furthermore, TSYS's insistence on the enforcement of its clear legal rights under a binding contract does not make its hands unclean. Allowing Green to avoid his contractual obligations because TSYS failed to do something the contract did not require it to do would be both inequitable and reversible error.

### C.   Breach of Covenants

The Court finds that TSYS is substantially likely to succeed in proving that Green breached these valid and enforceable covenants by going to work for BlueSnap. Green began working for BlueSnap in the restricted geographic area (North America and

Europe) within the restricted time period (one year after his termination).  He performs prohibited activities for BlueSnap under the terms of the covenants because his duties at BlueSnap include substantially the same duties he had at TSYS: managing the sales department and leading the strategic direction of that department.  *See* 2018 Stock Grant ex. A ¶ 3(a)(i) (defining "Prohibited Activities" as the "activities of the type conducted, provided, or offered by [Green] within two (2) years prior to his termination of employment); 2019 Stock Grant ex. A ¶ 3(a)(i) (same); *see also* 2020 Stock Grant § 15.1 (prohibiting Green from obtaining employment with a competitor "in which . . . [Green] has duties for (or provides services to) such Competitor that relate to Competitive Services and are the same or similar to those services actually performed by [Green] for TSYS"); Separation Agreement 3 (same).

Green argues that he did not breach the covenants by working for BlueSnap because BlueSnap would not be considered TSYS's competitor under the covenants' terms.  The covenants prohibit Green from working for a business that is engaged wholly or in part in offering services competitive with the business activities TSYS engaged in before Green's termination.  2018 Stock Grant ex. A ¶¶ 3, 3(a)(iii); 2019 Stock Grant ex. A ¶¶ 3, 3(a)(iii); 2020 Stock Grant § 15.4(a)-(b); Separation Agreement 4.  The 2020 stock grant and separation agreement covenants list, as an example of

such busines activity, "the provision of products and services to facilitate or assist with the movement in electronic commerce of payment and financial information . . . ." 2020 Stock Grant § 15.4(a); *see also* Separation Agreement 4. BlueSnap admitted that it facilitates the movement in electronic commerce of financial information. BlueSnap Dep. 70:7-12. It also admitted that it directly competed with TSYS 31 times in the last 18 months.

Green, nevertheless, argues that BlueSnap does not actually "compete" with TSYS because (1) BlueSnap focuses on a niche area of the payment sector (card-not-present transactions), (2) TSYS is a payment processor whereas BlueSnap is a payment facilitator, and (3) BlueSnap is a much smaller company than TSYS. These arguments fail. First, TSYS, like BlueSnap, provides card-not-present services so they do in fact compete in this niche area. Indeed, Green was responsible for TSYS's relationships with important customers, such as the GAP, who used these card-not-present services. *See* Green Dep. 41:8-15, 59:13-60:11; Kernodle Decl. ¶ 11; Kernodle Decl. attach. 1, Emails between J. Green and C. Ancona, *et al*. (Apr. 8, 2020), ECF No. 21-1 (showing Green was involved with negotiations with the GAP over issues related to their card-not-present business). Moreover, BlueSnap plans to begin offering card-present services, that Green would be responsible for selling, soon. BlueSnap Dep. 111:14-113:20, 114:5-115:4, 133:19-23, 134:5-9, 137:14-138:20. Therefore,

BlueSnap's card-not-present focus does not eliminate TSYS as a competitor.

Second, the distinction between a payment facilitator and payment processor is immaterial for purposes of the present motion. It goes to the methodology of how the two companies fulfill merchant needs, not to the services they ultimately provide merchants. *See* Kernodle Decl. ¶ 12 (explaining what a payment facilitator does). And, even if this distinction does matter, TSYS offered its own payment facilitation services platform called ProPay at the time of Green's termination, which Green's sales teams were directly responsible for marketing and selling. Kernodle Decl. ¶¶ 13-14; *id.* attach 2, Emails between J. Green and J. Kernodle, *et al.* (Mar. 11, 2020-Apr. 13, 2020), ECF No. 21-2 (strategic report on ProPay forwarded from Green). Therefore, TSYS and BlueSnap compete in the payment facilitation field.

Finally, the fact that BlueSnap is currently smaller than TSYS is irrelevant to their competitive relationship. There is nothing in the language of the covenants to indicate that a company's relative size has any bearing on whether it "competes" with TSYS's business. The Court declines to read such a limitation into the plain language of the contracts. Accordingly, BlueSnap is TSYS's competitor under the terms of the covenants.

In summary, TSYS has shown that it is substantially likely to succeed in showing Green breached these covenants by going to work for its competitor, BlueSnap.

## II.   Remaining Factors for Preliminary Injunction

The Court finds that the remaining factors weigh in favor of granting a preliminary injunction here.   TSYS would suffer irreparable harm without an injunction, as Green agreed in the covenants themselves.   See 2018 Stock Grant ex. A ¶ 1(a); 2019 Stock Grant ex. A ¶ 1(A); 2020 Stock Grant § 15.5; Separation Agreement 5.  Moreover, Green inevitably would use the confidential information he learned in his role at TSYS to compete against TSYS for BlueSnap, leaving TSYS with no realistic opportunity to combat this unfair competition.   This concern is not speculative; Green currently has possession of emails he forwarded himself which contain such confidential information.   TSYS has also presented evidence that BlueSnap is attempting to steal one of TSYS's existing software partners at this moment, which it believes Green may be helping to orchestrate.   Under Georgia law, injunctive relief is appropriate to prevent this type of harm that accompanies breaches of restrictive covenants.  *See Bijou Salon & Spa, LLC v. Kensington Enters., Inc.*, 643 S.E.2d 531, 534 (Ga. Ct. App. 2007) (affirming injunction against defendant who violated non-compete and non-solicitation agreements); *Poe & Brown of Ga., Inc. v. Gill*, 492 S.E.2d 864, 865 (Ga. 1997) ("Injunctive relief has repeatedly

been found appropriate in cases where covenants such as this have been found to be enforceable." (quoting *Rash v. Toccoa Clinic Med. Assocs.*, 320 S.E.2d 170, 174 (Ga. 1984))).

The threatened injury to TSYS outweighs whatever damage the preliminary injunction may cause Green.  Green agreed in the separation agreement that the covenants would not "unduly impair [his] ability to earn a living."  Separation Agreement 4.  And although the current state of the economy and global pandemic may make it more difficult for individuals to secure employment, Green assumed the risk that he would not be able to find alternative employment when he voluntarily agreed four separate times to abide by the non-compete covenants in exchange for valuable compensation and monetary benefits.  As experienced counsel well knows, the law does not permit sympathy to rescue someone from the unfortunate consequences of the deal he struck.

Finally, granting injunctive relief would serve the public interest.  Georgia has an interest in "protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state."  O.C.G.A. § 13-8-50.  The General Assembly has found that properly drafted covenants not to compete further this goal.  Georgia courts have also emphasized that employers are "entitled to protect [themselves] from the risk that a former employee might appropriate customers by taking unfair

advantage of the contacts developed while working for the employer" by entering into restrictive covenants. *Palmer & Cay of Ga., Inc. v. Lockton Cos. Inc.*, 629 S.E.2d 800, 802 (Ga. 2006) (quoting *W.R. Grace & Co. v. Mouyal*, 422 S.E.2d 529, 532 (Ga. 1992)). Enjoining an employee who knowingly breached a non-compete covenant certainly serves the public interest.

## PRELIMINARY INJUNCTION

For the foregoing reasons, the Court grants TSYS's motion for a preliminary injunction. Accordingly, Green is hereby enjoined from working for BlueSnap until the merits of this case are resolved at trial. Green is also enjoined from using or disclosing TSYS's confidential or trade secret information in his possession, custody, or control.[5]

The Court directs TSYS to give security in the amount of $275,000, finding that this amount would be proper to pay the costs and damages sustained by Green if he is found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c).

---

[5] TSYS also asks the Court to issue an order tolling the non-competition period in the covenants during the pendency of the breach of Green's obligations. Although the covenants in the 2018, 2019, and 2020 stock grants do contemplate that the restrictive time period will be tolled "if a court of competent jurisdiction . . . finds that the challenged restrictive covenant is enforceable," today's order only establishes that TSYS is *substantially likely* to show the covenants are enforceable— not that the covenants are actually enforceable. 2018 Stock Grant ex. A ¶ 9; 2019 Stock Grant ex. A ¶ 9; *see also* 2020 Stock Grant § 15.7 (similar tolling provision). Therefore, TSYS is not entitled to an order tolling the restrictive time periods at this time.

IT IS SO ORDERED, this 31st day of August, 2020.

                              S/Clay D. Land
                              _____
                              CLAY D. LAND
                              U.S. DISTRICT COURT JUDGE
                              MIDDLE DISTRICT OF GEORGIA